UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

BEAR CREEK PARTNERS I, LLC,                        Case No. DT 10-07906
                                                   Hon. Scott W. Dales
            Debtor.                                Chapter 11
_____/

### OPINION AND ORDER REGARDING CASH COLLATERAL AND RECEIVER MOTIONS

PRESENT:     HONORABLE SCOTT W. DALES
             United States Bankruptcy Judge


I. INTRODUCTION AND JURISDICTION

Shortly after entering an order for relief in this involuntary chapter 11 bankruptcy case, the court held an expedited hearing to consider the (1) Motion To Excuse Receiver From Turnover Pursuant To Bankruptcy Code Section 543(d) By CWCapital Asset Management LLC, Solely In Its Capacity As Special Servicer For The Trust (the "Receiver Motion," DN 17) and (2) Debtor-In-Possession's Amended Motion For Use Of Cash Collateral Pursuant To 11 U.S.C. § 363(c)(2)(B) (the "Cash Collateral Motion," DN 35).[1]

CWCapital Asset Management LLC as servicer for Bank of America, N.A. The bank is the trustee for the registered holders of ML-CFC Commercial Mortgage Trust 2007-6, Commercial Mortgage Pass-Through Certificates, Series 2007-6 (the "Trust"). The Trust, through its servicer, appeared in support of the Receiver Motion, and the debtor, Bear Creek Partners I, LLC (the "Debtor"), appeared in support of the Cash Collateral Motion. In addition, the state court receiver, Unified Management Services, L.L.C. d/b/a Midwest Management

_____

[1] At the hearing, the parties stipulated to dismiss a related adversary proceeding through which the Debtor sought injunctive relief.

Services (the "Receiver"), and the United States Trustee appeared at the hearing, but took no meaningful part in the proceedings. Significantly, in the court's view, the petitioning creditors[2] did not appear or otherwise participate, though they had notice of the hearing.

By agreement, the parties consolidated their presentations on both motions, stipulating to several non-controversial facts, and offering testimony and documentary evidence for the rest of their respective cases. The following constitutes the court's findings of fact and conclusions of law, in accordance with Rule 52, made applicable to these contested matters by Rules 9014(c) and 7052.

The court has jurisdiction over the Debtor's chapter 11 case pursuant to 28 U.S.C. § 1334(a). Pursuant to 28 U.S.C. § 157(a), the United States District Court has referred the case and all related proceedings to this court under LCivR. 83.2(a) (W.D. Mich.). The motions qualify as "core proceedings" within the meaning of 28 U.S.C. § 157(b)(2)(E) and (M). Accordingly, the court has authority to enter a final judgment resolving these contested matters.

For the following reasons, the court will grant the Receiver Motion and deny the Cash Collateral Motion.

## II. ANALYSIS

### A. Factual Background

The parties stipulated, and the court finds, that the Trust, as the Debtor's principal secured creditor, is the holder of the following loan documents (the "Loan Documents") evidencing and securing the Debtor's debt:

---

[2] Fryling Construction Company, Inc., Benchmark Engineering, Lakeview Cleaning & Restoration, LLC, and MARCO, LLC signed the involuntary petition as "Petitioning Creditors."

a) Promissory Note dated December 27, 2006, in the original principal amount of $9,600,000.00 (as subsequently assigned, the "Note");

b) Mortgage dated December 27, 2006 (as subsequently assigned, the "Mortgage"), which was recorded on January 19, 2007 in Liber 1087, Page 552, Emmet County Records;

c) Assignment of Leases and Rents (as subsequently assigned, the "ALR"), which was recorded January 19, 2007 in Liber 1087, Page 553, Emmet County Records; and

d) UCC-1 Financing Statement (as subsequently amended, the "Financing Statement"), which was recorded on January 19, 2007 in Liber 1087, Page 555, Emmet County Records.

*See* Stipulation for August 10, 2010 Hearing (the "Stipulation," DN 45).  In addition, the Trust and the Debtor agreed that the Trust has a valid and properly perfected lien and security interest in the real property commonly known as the Bear Creek Meadows apartment complex, located at 2370 Anderson Road, Petoskey, Michigan 49770 (the "Real Property"), and certain personal property, including rents from the Real Property (the "Personal Property," and with the Real Property referred to collectively herein as the "Collateral"). The parties stipulated that the Debtor's debt to the Trust exceeds the value of the Collateral. *Id.* According to the Debtor's schedules,[3] the Real Property is worth $2,500,000.00.  In addition, the Debtor scheduled the Trust's claim as $12,500,000.00. Under 11 U.S.C. § 1111(a) and Rule 3003(b)(1), this admission constitutes *prima facie* evidence of the validity and amount of the Trust's claim. The Trust, therefore, is substantially undersecured.

The parties also agreed that the Trust is not the only entity claiming an interest in the Real Property.  Specifically, Fryling Construction Company, Inc. ("Fryling") asserts a construction lien in the Real Property. Although the Trust disputes its validity and priority, the

---

[3] The Schedules (DN36-38) constitute the Debtor's admissions, which the court may consider under Fed. R. Evid. 201.

Debtor has scheduled Fryling's claim as $834,079.00, without characterizing it either as disputed, contingent, or unliquidated. *See* Schedule D (DN 36).

In addition to these stipulated facts, the Trust offered the testimony of Andrew John Hundertmark III, a senior vice president and asset manager working for CWCapital Asset Management LLC, the Trust's "special servicer." Mr. Hundertmark managed the Trust's relationship with the Debtor prior to the Receiver's appointment, at which time he relinquished his duties to Mr. James Gray, who did not testify at the hearing. The Trust also called Kelly Marie Morris, a property manager involved in the Receiver's day-to-day management of the Collateral.  Ms. Morris had personal knowledge of the Receiver's involvement with the Debtor and the Collateral. Both witnesses testified credibly about matters within their personal knowledge.

For its part, the Debtor offered the testimony of Scott A. Chappelle, the president of Strathmore Development Company Michigan, LLC ("Strathmore Development"), the entity that serves as the Debtor's manager pursuant to the company's operating agreement. Mr. Chappelle credibly testified about his involvement with the Real Property from the project's inception (as developer) through its operation and eventual receivership. Strathmore Development managed the Real Property before the Receiver's appointment, and manages the real estate of the Debtor's affiliate -- Bear Creek Partners II, LLC ("BCPII").  BCPII is not a debtor in bankruptcy.

By way of background, Mr. Chappelle explained that the Bear Creek Meadows apartment complex is actually and almost seamlessly divided into two "phases" which the parties referred to as "Phase I" and "Phase II."  Phase I is a six building, 120 unit apartment complex comprising the Trust's Collateral. The Debtor owns Phase I, which was completed sometime in 2006.  Phase I is within the property of the Debtor's bankruptcy estate.

Page 5 of 19

Phase II, in contrast, is a partially completed group of apartment buildings, with 80 units presently rented or available for rent.  BCPII owns Phase II, which is not within the property of the Debtor's bankruptcy estate. At the inception of the Bear Creek Meadows apartment project, the Debtor and BCPII intended to operate Phase I and Phase II as a single, integrated complex, sharing roads and other infrastructure, a common club house, pool, and other amenities, as well as related expenses.  For reasons related to complications during the initial development and financing of the project, however, the Debtor and BCPII divided the ownership of Phase I and Phase II between the Debtor and BCPII, respectively. Mr. Chappelle testified that even with the division of ownership, Phase I and Phase II were meant to be operated under a common property manager in order to achieve economies of scale and to avoid competition for tenants between the two complexes -- competition that witnesses for both parties clearly abhor.

From the start, litigation and financing problems dogged Bear Creek Meadows and the Debtor.  Mr. Chappelle testified, for example, that the Debtor is still involved in litigation with Bear Creek Township over land use regulation, and the City of Petoskey initially balked at extending water and sewer connections to the project.  Mr. Chappelle also alluded to fire damage at the complex.

Perhaps more damning, however, was the faltering real estate market in northern Michigan over the last several years.  According to Mr. Chappelle, by March, 2008, because of the downturn in the economy, the Debtor was unable to service its debt to the Trust.  On or about October 31, 2008, the Trust sent the Debtor a formal notice of default and acceleration.  Shortly thereafter, the Trust commenced litigation in the Emmet County Circuit Court, and on April 9, 2009, with the Debtor's consent, obtained the state court's order appointing Midwest Management Services as the Receiver.  The Debtor honored the state court's Order Appointing

Receiver (Exhibit 8, the "Receivership Order"), relinquishing the Collateral on or about April 16, 2009. The Receiver has been in possession and control ever since.   By filing the Receiver Motion, the Trust seeks an order from this court continuing that possession, notwithstanding the edict of 11 U.S.C. § 543(b), which typically requires custodians such as the Receiver[4] to deliver estate property to the trustee or, in this case, to the Debtor, as debtor-in-possession.

B.  Receiver Motion

The Bankruptcy Code specifically acknowledges that, from time to time, a bankruptcy petition may be filed, commencing a case and creating an estate comprised of property owned by the debtor, but held by a "custodian," including a receiver.  Ordinarily, a custodian "shall":

> (1) deliver to the trustee any property of the debtor held by or  transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

> (2) file an accounting of any property of the debtor, or  proceeds, product, offspring, rents, or profits of such property,  that, at any time, came into the possession, custody, or control of  such custodian.

11 U.S.C. § 543(b). Recognizing, however, that such turnover is not invariably in the best interests of creditors, Congress prescribed a safety valve in Section 543(d), by giving the court discretion, under appropriate circumstances, to excuse compliance with Section 543.   That subsection provides, in relevant part, as follows:

> (d) After notice and hearing, the bankruptcy court--

> (1) may excuse compliance with subsection (a), (b), or (c) of this section [543] if the interests of creditors and, if the debtor is not insolvent, of equity

---

[4] The parties agree that the Receiver is a custodian within the meaning of 11 U.S.C. §§ 101(11) and 543.

> security holders would be better served by permitting a custodian to continue
> in possession, custody, or control of such property . . .

11 U.S.C. § 543(d). The Debtor agrees that it is insolvent, and according to the schedules, its liabilities exceed its assets. *See* Brief In Support Of Debtor-In-Possession's Response To The Motion To Excuse Receiver From Turnover Pursuant To Bankruptcy Code Section 543(d) By CWCapital Asset Management LLC, Solely In Its Capacity As Special Servicer For The Trust ("Debtor's Brief," DN 34-2, p. 9); Summary of Schedules (DN 36-1, p. 14 of 30); 11 U.S.C. § 101(32)(A); Fed. R. Evid. 201. Under Section 543(d), therefore, the court should consider only whether the "interests of creditors" would be "better served" by permitting the Receiver to continue in possession of the Collateral. *See also* Debtor's Brief at p. 9.

The court finds the analysis in *In re Northgate Terrace Apartments, Ltd.*, 117 B.R. 328 (Bankr. S.D. Ohio 1990), to be helpful authority from within our Circuit. As set forth in that opinion:

> In analyzing the creditors' interests, the court will examine the likelihood of
> a reorganization, the probability that funds required for reorganization will be
> available, whether there are instances of mismanagement by the debtor, and
> whether turnover would be injurious to creditors.

*Northgate Terrace*, 117 B.R. at 332.[5] In addition, having reviewed a number of cases, the court concludes that the overarching consideration is what is in the best interest of the creditors generally, not simply the creditor holding the principal secured claim.

The Debtor is a single-purpose entity with assets limited primarily to the Collateral and related property. Therefore, the rents from Bear Creek Meadows Phase I constitute the sole source of funding for any Chapter 11 reorganization. The Loan Documents and the parties'

---

[5] Although the court recognizes that under the facts of the *Northgate Terrace* case, the bankruptcy court directed the custodian to turn over the apartment complex, the court has discretion under the facts and circumstances of this case to rule otherwise.

stipulation establish that the rents are fully encumbered by a lien favoring the Trust.  Regardless of whether the ALR is absolute or for security, it is clear that the Debtor will not have recourse to rents without the Trust's consent, or an order from this court after a showing by the Debtor that it can adequately protect the Trust's interests.  As set forth below in the court's discussion of the Cash Collateral Motion, the court finds that the Debtor has not met its burden of establishing adequate protection, and concludes that the Debtor will be unable to fund any reorganization using the rents.

Although Mr. Chappelle suggested that certain investors, including an entity controlled by Mr. Chappelle's business associate, Mr. Crouch, may be interested in advancing new value in support of a Chapter 11 plan, Mr. Crouch did not testify in support of any new value proposal. The court recognizes that it is early in the life of this Chapter 11 case, but the controversy between the parties has been pending since 2008 and Mr. Crouch, according to Mr. Chappelle's testimony, has already expressed an interest in purchasing the Trust's loan documents for a substantial discount.  Without testimony from Mr. Crouch, however, the court is left to speculate about the efficacy of any new value proposal. Therefore, the first two factors of *Northgate Terrace* -- the likelihood of reorganization and the probability that funds required for reorganization will be available -- favor continuing possession with the Receiver.

With respect to the other consideration described in *Northgate Terrace* -- the Debtor's prepetition mismanagement -- the Trust's case in chief offered no persuasive evidence of such mismanagement, save for the Debtor's alleged mishandling of tenant security deposits.  Ms. Morris's testimony established that when the Debtor turned over the property to the Receiver in April of 2009, the Debtor remitted no security deposits. State law requires landlords either to retain security deposits in a separate account or to post a bond, as Debtor's counsel argued at the

hearing.  *See* MCL § 554.604.  However, the Debtor offered no evidence that it either retained the security deposits or posted a bond, and so based on the present record, the Debtor may have mismanaged the security deposits entrusted to it by the tenants.  As for the Debtor's other defaults under the Loan documents, such as failing to make payments on account of the secured indebtedness and to fund various escrow accounts for taxes and insurance, the court does not attribute such defaults to mismanagement.  Instead, the court credits Mr. Chappelle's explanation that those defaults derived from a poor economic climate rather than from fraud, misconduct or other mismanagement.  Consequently, on balance, the "mismanagement" factor does not counsel either in favor or against turnover.

In considering a turnover motion under Section 543, some courts have also considered the availability of preference avoidance and recovery -- remedies typically available only in the bankruptcy forum.  Because the Receiver has been in possession of the Debtor's assets prior to the commencement of the bankruptcy case, the possibility of any preference recoveries is certainly remote.  The Receiver has been the entity incurring and paying the obligations to maintain and operate the Debtor's assets for over 15 months. It is unlikely that the Receiver made any payments on account of the *Debtor's* antecedent debts during this time.  In addition, the Receiver necessarily made payments using property already encumbered by the Trust's lien, so it seems unlikely that any such payments would have depleted the future bankruptcy estate, further undercutting any *prima facie* case for avoidance.  In any event, the Debtor retains the right to pursue avoidance actions, regardless of the outcome of the Receiver Motion.  It is true, of course, that the Debtor may not have the funds needed to pursue avoidance in this proceeding without turnover of the rents, but this hardship flows more from the requirement of adequate

protection of cash collateral interests than any decision under Section 543(d) permitting the Receiver to retain possession of the Collateral.

Although the Trust did not offer evidence of the costs associated with the Chapter 11 proceedings, from the court's experience it is fair to note that the estate, and therefore the unsecured creditors, would be required as a practical matter to pay for estate professionals, United States Trustee fees, and potentially the fees of the Petitioning Creditors and Creditors Committee, if formed.  According to the Receivership Order, in contrast, the costs of the Receivership will be borne by the Trust because the Receivership Order effectively surcharges the Trust's Collateral.

Furthermore, although not among the factors expressly listed in Section 543(d), the capacity of the Debtor's principals to single-mindedly honor the Debtor's fiduciary duties has concerned the court from the inception of the case.  This concern derives principally from the court's review of the Debtor's Answer to Involuntary Petition ("Answer," DN 8), and from the Debtor's position with respect to the Receiver Motion.  In the Answer, the Debtor candidly implies that it could not file a voluntary petition under Title 11 nor could it consent or acquiesce in the entry of an order for relief in an involuntary case because of the impact of pursuing such relief upon the Debtor's principals' guarantee obligations.  As explained in the Answer,

> By way of further response, BCPI states that the Bank of America debt is guaranteed by Scott A. Chappelle, Laura A. Chappelle, Kevin T. McGraw and Sharon McGraw ("Guarantors"), a copy of which Guaranty of Recourse Obligations ("Guaranty") is attached as Exhibit A. Pursuant to ¶ 17 of the Guaranty [sic],[6] the indebtedness of BCPI supported by the Guaranty is non-recourse as to Guarantors unless, inter alia, BCPI acquiesces in the filing of an involuntary petition against BCPI.

---

[6] The reference should be to section 17 of the Promissory Note dated December 27, 2006.

*See* Answer at ¶ 4.  The Debtor permitted the Receivership to continue without complaint for over 15 months, but now strenuously advocates for the full protections of Title 11.  If Title 11 affords advantages to the Debtor's creditors, the Debtor could have sought such relief sooner, or at least it should have acquiesced in the entry of an order for relief.  But as the Debtor itself explained, the parochial interests of its principals prevented it from pursuing or acquiescing in such relief.

In addition, pursuant to Mr. Chappelle's guaranty and the other Loan Documents, he may be unwilling to permit the Debtor to effect certain transfers or other transactions coming within the prohibitions of Article 6 of the Loan Agreement, lest such transactions constitute a "Full Recourse Event" and trigger his, and his wife's, guaranty liability.  For his part, Debtor's counsel forthrightly disclosed numerous prepetition connections with Mr. Chappelle, his wife, and their associates in connection with BCPII and other affiliated entities.  *See* Amended Affidavit Of Disinterestedness Of Attorney Re Appointment As Counsel For Debtor-in-Possession And Statement Regarding Compensation (DN 28) at ¶ 5. Unfortunately, however, these disclosures may call into question Debtor's counsel's disinterestedness. *See* 11 U.S.C. § 101(14)(C).

The court does not make these observations to suggest impropriety -- full disclosure suggests otherwise -- but only to substantiate the court's concern that the Debtor's management may have incentives to subjugate the interests of the Debtor and its creditors to those of the Debtor's principals.  Under the circumstances, the court will not blindly re-vest possession of the Collateral in the Debtor.

As for the Debtor's arguments, a significant reason for divesting the Receiver of possession of the property of the estate derives from Mr. Chappelle's original understanding of the development, namely that Phase I and Phase II should be operated under a single

management to obtain economies of scale.  The court, however, is not willing to premise relief under Section 543 on the suppression of competition between the Debtor and BCPII, even though plausibly beneficial to the creditors of the Debtor. Mr. Chappelle testified that the Bear Creek Meadows apartment complex is one of a very few market-rate apartment complexes within a 50 mile radius and is "the only game in town." As such, Mr. Chappelle's testimony suggests that the Debtor derives considerable market power in the Petoskey rental market from the nature of the Bear Creek Meadows complex. This power is diminished by competing with BCPII.  The court must be mindful of the public interest in the communities affected by its proceedings, and therefore hesitates to promote anti-competitive behavior on the part of its trustees or debtors-in-possession.  *Cf.* 28 U.S.C. § 959(b).

In addition, the Debtor's arguments in support of an incipient reorganization plan, designed to counter the Trust's case regarding the futility of reorganization, are somewhat fanciful given the extent of the Trust's claim and the stipulation that the claim exceeds the value of the Collateral, particularly given the undisputed fact that the Collateral constitutes the entire universe of property of the estate.  Indeed, as noted above, the Trust has a $12,500,000.00 claim secured by the Collateral worth approximately $2,500,000.00, according to the Debtor's schedules.  In addition, Fryling asserts a substantial lien in the same realty.

The Debtor further attempted to cast aspersions on the Receiver's management of the Bear Creek Meadows apartment complex by offering two binders containing police reports made during the Receiver's tenure.  At first blush, the volume of police reports allegedly allocable to Phase I (managed by the Receiver) overwhelmed the volume of police reports allocable to Phase II (managed by Strathmore Development).  However, the Trust's counsel's cross-examination of Mr. Chappelle regarding the police reports, and Mr. Chappelle's own candor on this topic,

undercut substantially the Debtor's reliance on these documents as evidence of the Receiver's incompetence or mismanagement. As counsel pointed out through her cross-examination, the inferences that the Debtor asked the court to draw based upon the police reports were unwarranted and unpalatable. The unstated premise of the Debtor's argument is that the Receiver, by cutting rents, has rented to low income and presumably lower quality tenants, ascribing to such persons a propensity for mischief and confrontation with police authorities. The court is unwilling to indulge that unhappy presumption. More to the point, the court also notes that many of the police reports included within Exhibit 15 were of a routine nature, including such mundane episodes as pet rescues, false fire alarms, teenagers in a hot tub and other such occurrences normally associated with apartment life.

With respect to the supposed tenancy of a recently-emancipated felon, the evidence established that the felon frequented the premises, but it did not establish that he did so as the Receiver's own tenant rather than, say, a guest of other tenants -- perhaps tenants that the Debtor selected before the Receiver's appointment.

The Receiver's documentary evidence established without contradiction that the occupancy has increased under the Receiver's tutelage from roughly 78% to approximately 89% and that net operating income has also risen. Of course, this may be attributable to the Receiver's management philosophy involving rent concessions and other discounts or it may be attributable to changes in the economy.

With respect to the Receiver's failure to challenge the taxing authority's assessed value, the court agrees that a more aggressive receiver might have pursued such relief, but does not find from the Receiver's inaction any mismanagement.

With respect to insurance, the Debtor's Exhibit 23 established that the Trust intended to insure the collateral with its own carrier under its blanket policy.  Nevertheless, from the relatively modest line item on Exhibit G for insurance, and from the recently provided certificate of insurance showing liability (rather than casualty) coverage, the Debtor infers that the Receiver has failed to maintain insurance.  Although the court highly doubts that the Trust would permit its Collateral to remain uninsured, the Debtor's inference based on Exhibits G and 21 is not unwarranted.  Nevertheless, because the parties stipulated that the debt exceeds the value of the collateral, any hardship resulting from the lack of casualty insurance, if in fact there is no such insurance, would be visited upon the secured creditors first and foremost.  In other words, the secured creditors bear the risk in this regard, and lack of casualty insurance would not likely affect the interests of the creditors (though it might affect BCPII).

In sum, the court does not find in the record any basis premised on the Receiver's actions for displacing the Receiver.

Finally, the court notes that, notwithstanding the initial involvement of the Petitioning Creditors, they did not attend the hearing or otherwise give the court their views on whether the Receiver should remain in possession.  Although it is tempting to infer that the Petitioning Creditors, or some of them, favor the bankruptcy forum, it is also possible to infer that these creditors have since concluded that the benefits of the proceeding did not justify their participation in the hearing.  Even the United States Trustee, who typically advocates for the interests of unsecured creditors in the early days of a Chapter 11 proceeding, took no position.

Although the interests of the unsecured creditors would not necessarily be better served through the state court receivership, the secured creditors' interests would be advanced by keeping the assets in that forum.  The Receiver has been in place for 15 months, and the state

court provides a forum for resolving the dispute between the Trust and Fryling (a dispute that has been formally pending in that forum since 2008).[7] On balance, the interests of the creditors who have a meaningful stake in the outcome of various disputes between the Trust, Fryling, and the Debtor would be better served in the receivership proceedings.

C.  Cash Collateral Motion

The Bankruptcy Code, specifically 11 U.S.C. § 363, forbids any debtor or trustee from using cash collateral without the permission of all parties holding an interest therein, or without an order approving an adequate protection proposal.  It plainly appears that the Trust has not consented to the use of its cash collateral, which therefore requires the Debtor to obtain an order authorizing such use.  The parties' Stipulation establishes that the Trust, though undersecured, has a lien on the Debtor's cash collateral in the form of rents.  Under 11 U.S.C. § 363(p)(1), the Debtor bears the burden of proving adequate protection in exchange for the proposed use. The Debtor attempts to limit the Trust's lien on the rents (and therefore the Debtor's adequate protection obligation) in at least two ways.

First, the Debtor contends that the Receivership Order limited the Trust's collateral by requiring the Receiver to first pay receivership expenses and property maintenance before remitting the surplus each month to the Trust as its "collateral."  This is a patently unreasonable interpretation of the state court's order. By agreeing that the Receiver would first pay management fees and property maintenance expenses, the Trust simply acknowledged that its collateral would, in effect, be surcharged for the cost of the receivership. Agreeing to the surcharge is not tantamount to waiving the lien that, under the Loan Documents, would

---

[7] The Emmet County Circuit Court has scheduled a pretrial conference for September 10, 2010. *See* Statement of Financial Affairs (DN 36).

otherwise inure to the Trust's benefit. The Receivership Order contains no hint of waiver, and the court declines to give it the interpretation the Debtor advocates.

Second, the Debtor seeks to limit the Trust's lien under 11 U.S.C. § 552 ("Section 552"). In effect, the Debtor proposes, by invoking the court's equitable powers under the last clause of Section 552(b)(1), to take away the lien on future rents otherwise available under the remainder of Section 552(b)(1). Having wiped out the lien on future rents, the Debtor proposes to give the Trust a replacement lien on those same future rents. To fortify this proposal, the Debtor advances the theory, with some support in the cases,[8] that simply rolling over the monthly rentals from month to month adequately protects the Trust's interests in the rents. The court believes that this proposal is insufficient. As Judge Stevenson observed, "current rents cannot be used to provide adequate protection for previous payments because the mere act of doing so would make it impossible to provide adequate protection for current payments." *In re Mount Pleasant Ltd. Partnership*, 144 B.R. 727, 737 (Bankr. W.D. Mich. 1992).[9] The parties have agreed that the Trust has a lien on all rents. Although the rents may be included within the property of the estate,[10] this fact alone bestows no benefit on the Debtor unless the Debtor provides adequate protection. The Debtor, as a single-purpose entity, has no unencumbered property with which it could provide adequate protection in the form of a replacement lien, periodic payments, or otherwise. Giving the Trust a replacement lien on its own overtaxed Collateral does not satisfy the dictates of adequate protection.

---

[8] *See*, *e.g.*, *In re Wrecclesham Grange, Inc.*, 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997); *In re Megan-Racine Assocs., Inc.*, 202 B.R. 660, 663 (Bankr. N.D.N.Y. 1996).

[9] The court recognizes that *Mt. Pleasant Ltd. Partnership* has been superseded by the 1994 amendments to Section 552(b), but only with respect to the portion of the decision insisting on prepetition perfection of an assignment of rents in accordance with applicable law.

[10] The court is suspicious of the Trust's argument that the ALR is absolute, rather than for security, in view of Michigan's statutory regulation of such assignments, but need not resolve the issue because of the Debtor's inability to provide adequate protection in any event. *See* MCL § 554.231 *et seq.; see also Condor One, Inc. v. Turtle Creek, Ltd. (In re Turtle Creek, Ltd.)*, 194 B.R. 267, 278 (Bankr. N.D. Ala. 1996) (courts must closely scrutinize claims of absolute assignment).

Moreover, the Debtor's proposal is inconsistent with Section 552 to the extent that that section extends the Trust's lien to after-acquired rents. 11 U.S.C. § 552(b). In order to avoid the effect of Section 552(b)'s presumptive enforcement of prepetition after-acquired property clauses, Debtor's counsel argued that the court should exercise its equitable powers under the last clause of Section 552(b)(1) to divest the Trust of its lien on future rents. Such a remedy, however, would depend on sufficient proofs that the equities favored the Debtor. Here, however, the court failed to perceive any such equities. Indeed, the testimony of Mr. Chappelle offered no persuasive equitable concerns, and seemed premised largely on the desire to avoid competition between the Debtor and BCPII. As noted above with respect to the Receiver Motion, the court does not regard such anti-competitive motives as sufficient to invoke the aid of equity. In short, the record does not support relief under Section 552(b)(1).

Even though the Debtor may be forgiven for being less than precise in its proposed use of cash collateral because it has been out of possession of Phase I for over 15 months, the Debtor's management has ample experience managing apartment complexes in Michigan and Florida, and indeed the complex adjacent to Phase I. This experience ought to have permitted the Debtor to provide some details with respect to budgets and projected income regarding Phase I, even if accompanied by a caveat recognizing its lack of possession for many months. In other words, the Debtor might have used the Receiver's figures, coupled with its own experience, to make a forecast. Instead, the Cash Collateral Motion provides no meaningful budget projections in support of the use of the Trust's undisputed cash collateral. Such a budget would include, in addition to property management expenses, an estimate of Chapter 11 expenses.

Finally, in view of the court's decision to permit the Receiver to remain in possession of the Collateral and the fact that that the Receivership Order obligates the Receiver to manage and

preserve the assets, the court perceives no efficacy in granting the Debtor the right to use cash collateral over the Trust's objection. The Debtor is a special purpose entity with limited assets entirely within the Receiver's control.

## III. CONCLUSION AND ORDER

Under the facts and circumstances presented at the hearing, and based on the court's review of the docket and prior proceedings, the court finds that the Trust and the Receiver have made a persuasive case for continuing the Receiver in possession by showing the futility of the Debtor's reorganization and adequate protection proposal. The court will grant the Receiver Motion. However, as a condition of granting the motion, the court will require the Receiver to comply with the same reporting requirements that the United States Trustee imposes on the Debtor, and participate in the first meeting of creditors as a designee under Rule 9001(5).

In addition, because the Debtor has not met its burden of proving adequate protection of the Trust's interest in the cash collateral, the court will deny the Cash Collateral Motion.

Finally, the court recognizes that the relief awarded in this Opinion and Order necessarily implies relief from the automatic stay to some extent. The court intends to permit the Receiver to continue managing the Collateral, but does not thereby intend to authorize any extraordinary transactions, such as a sale of Phase I through the state court, without further authority from this court. To the extent that this Opinion and Order leaves the Receiver in doubt about the scope of its authority -- a realistic concern given that the Collateral is to some extent in the custody of two courts -- the federal court remains available, upon proper motion, to provide further direction.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. The Receiver Motion (DN 17) is GRANTED;

2. The Receiver shall, during the pendency of this case, comply with the United States Trustee's reporting requirements otherwise applicable to debtors-in-possession;

3. The Receiver, through a representative familiar with the Collateral, shall attend the first meeting of creditors and any adjournments of the meeting, and give testimony as a designee under Rule 9001(5); and

4. The Cash Collateral Motion (DN 35) is DENIED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Heather Deans Foley, Esq., Joel D. Applebaum, Esq., Kevin A. Fanning, Esq., Norman C. Witte, Esq., Robert F. Wardrop, II, Esq., Michelle Wilson, Esq., Brian R. Trumbauer, Esq., the 20 largest creditors, and all parties requesting notice of proceedings.

END OF ORDER

**IT IS SO ORDERED.**

Scott W. Dales
United States Bankruptcy Judge

**Dated: August 13, 2010**